1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10  SUZANNE SALAZAR,                    )  No. ED CV 04-00834 PJW
                                        )
11                 Plaintiff,           )
                                        )
12            v.                        )  MEMORANDUM OPINION AND ORDER
                                        )
13  JO ANNE B. BARNHART,                )
    Commissioner of the Social          )
14  Security Administration,            )
                                        )
15                 Defendant.           )
    _____)

16

17                                    I.

18                              INTRODUCTION

19        Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20  1383(c)(3), seeking reversal of the decision by Defendant Social

21  Security Administration ("Agency") denying Supplemental Security

22  Income ("SSI") benefits.  Alternatively, she asks the Court to remand

23  the case to the Agency for further proceedings.  After reviewing the

24  record and for the reasons discussed below, the Agency's decision is

25  AFFIRMED and the case is DISMISSED.

26

27

28

II.

BACKGROUND

Plaintiff was born on September 12, 1961, and was 42 years old at the time of the administrative hearing.  (AR 11, 50.)  She has a tenth-grade education, and has past relevant work as a caretaker, warehouse lead, cashier, waitress, fast-food worker, and cleaner.  (AR 11, 57-63, 291-92.)

Plaintiff filed protectively for SSI benefits on May 21, 2002, alleging disability since April 24, 2002.  (AR 11, 50.)  The cause of her alleged disability was scoliosis, osteoarthritis, and depression. (AR 11, 26.)  After the Agency denied Plaintiff's disability claim initially and on reconsideration, she timely requested a hearing before an administrative law judge ("ALJ").  (AR 26-35.)

A hearing was held on September 22, 2003.  (AR 288-318.) Plaintiff appeared with counsel.  (AR 288-89.)  The ALJ first heard Plaintiff's testimony.  (AR 291-301, 306-08, 311-12.)  Next, the ALJ heard the testimony of Dr. Joseph Malancharuvil, a medical expert. (AR 296, 301-05.)  Afterward, vocational expert Stephen M. Berry testified.  (AR 305-312.)  Finally, the ALJ heard from Plaintiff's daughter, Ms. Elena Guitierrez.  (AR 313-18.)

Plaintiff recited her general work and educational background. (AR 292-94.)  She admitted that she was a high-school dropout and stated that, although she had been addicted to drugs and alcohol, she had been clean and sober for a decade.  (AR 291-92.)  She explained that she was a "lead person" at her warehouse job, with responsibility for assigning, supervising, evaluating, and hiring and firing employees in the absence of her supervisor.  (*See* AR 306-07.) Plaintiff testified that her job as a cashier at an AM/PM market

2

involved some cooking of hamburgers and hot dogs. (AR 307-08.) She clarified the record as to her responsibilities for in-home services, stating that she was responsible only for cleaning tasks. (AR 308.)

When asked why she could not work, Plaintiff replied that "'96 was a bad year." (AR 294.) She explained that, within a six-month period in 1996, her father, her son, and one of her brothers died. (AR 294.) Although Plaintiff admitted these three losses occurred six years previously and that she had held a job for a year and a half after 1996, she insisted that she still "[didn't] feel like doing anything," and maintained that her mental problems and scoliosis were disabling. (*See* AR 294-95.) Specifically, Plaintiff complained of feeling "jittery," concentration deficits, and "crying spells," and added that her medication caused drowsiness. (*See* AR 311-12.) Plaintiff stated that she saw a doctor for counseling one hour each month, and explained that she was taking Risperdal for auditory hallucinations, Wellbutrin and Effexor for depression, and Cogentrin and Ziquell for sleep, all of which helped her "a little bit." (*See* AR 295-96, 300.) She admitted that she still took Methadone, but insisted that she had been drug-free for ten years and denied using it because of any recent relapse in her heroin addiction. (AR 297-98.)

The ALJ next heard from Dr. Malancharuvil, the medical expert. (*See* AR 296, 301-05.) After examining the record, he concluded that Plaintiff suffered from an unspecified depressive disorder with a recent major depressive episode. (AR 301-02.) He added that this condition had been severe for only a six-month period, between October 2002 and March or April 2003, with only mild depression dating back to the alleged onset date. (*See* AR 302-04.) Dr. Malancharuvil noted that the objective evidence showed no work-related limitations but

3

1   opined that, even if Plaintiff's testimony were given full credit, she
2   should still be able to work at "moderately complex tasks in an
3   objectory [*sic*] work setting."   (AR 304.)

4        The vocational expert, Mr. Stephen M. Berry, testified next.   (AR
5   305, 308-11.)   After he characterized the skill- and exertional-levels
6   of Plaintiff's prior work, (*see* AR 308), the ALJ posed the first of
7   three hypothetical questions:

8        [A]ssume a 42-year-old individual with a 10th grade
9        education and work experience as outlined by yourself in the
10       report and testimony today.   This individual can sit six
11       hours out of an eight-hour day, stand or walk six hours out
12       of an eight-hour day with normal workday breaks.
13       Occasionally lift 20 pounds, frequently lift 10 pounds.   She
14       can occasionally climb stairs, bend, balance, stoop, kneel,
15       crouch, and crawl.   Precluded from climbing ladders, ropes,
16       and scaffolding.   And she's precluded from constant power
17       gripping, grasping, and twisting.

18   (AR 309.)   The vocational expert opined that this hypothetical person
19   could perform Plaintiff's prior work as a waitress, cleaner, and fast-
20   food worker.   (AR 309.)   The ALJ's second hypothetical question was
21   the same, except that he asked the expert to assume that the person
22   would be limited to "moderately complex tasks in an object-oriented
23   environment."   (AR 309.)   The vocational expert opined that this
24   second hypothetical person could perform Plaintiff's prior work as a
25   cleaner, but none of her other jobs.   (AR 309.)   In his third
26   hypothetical question, the ALJ asked the expert to assume that
27   Plaintiff could perform none of her prior work, and inquired whether
28   there were other jobs in the national economy that she could perform.

4

1  (*See* AR 309-10.)  The expert testified that, even assuming she could
2  not perform any of her former jobs, she could perform work as an
3  inspector in light assembly.[1]  (*See* AR 310.)

4       Finally, the ALJ heard from Ms. Elena Gutierrez, Plaintiff's
5  daughter.  (AR 312-18.)  Ms. Gutierrez stated that she had lived "a
6  couple of doors down" from Plaintiff for the preceding six months, and
7  had lived with Plaintiff prior to that time.  (AR 313.)  She stated
8  that she saw Plaintiff daily for approximately "six hours of the day"
9  when her husband was at work, and for approximately one hour every
10 other day on her husband's days off.  (AR 313-14.)  She stated that
11 she would go to her mother's apartment at around 10 or 11:00 a.m. to
12 wake her up, clean the apartment and do her mother's laundry;
13 Plaintiff, meanwhile, would stay awake "for a little while" before
14 going back to sleep.  (AR 314-15.)  Ms. Gutierrez stated that, other
15 than that, Plaintiff "usually sleeps all day."  (AR 318.)  Ms.
16 Gutierrez added that she did not witness her mother grooming herself
17 or preparing her meals, and stated that she "rarely" saw Plaintiff
18 reading, and admitted that she did not know what her mother did at
19 night.  (*See* AR 316, 318.)  Ms. Gutierrez estimated that she saw
20 Plaintiff crying "maybe twice a month."  (AR 317.)  She testified that

21

22       [1]  Plaintiff's attorney then posed a fourth hypothetical
23 question, in which he asked the expert to assume "a hypothetical
   person who is going to miss three or more days a month on a consistent
24 basis."  (AR 311.)  The vocational expert opined that "[i]t would be
   extremely difficult to maintain employment with that number of days
25 missed per month."  (AR 311.)  As a fifth hypothetical question,
   Plaintiff's counsel asked the expert to assume a person whose
26 "symptoms [required] extra breaks during the day, [...] an extra half
   an hour in the morning, extra half an hour in the afternoon."  (AR
27 311.)  Once more, the vocational expert concluded that this person,
   too, would find it "very difficult to sustain employment."  (AR 311.)
28

                                     5

1   Plaintiff drove herself to her doctor's appointments, but added that
2   she accompanied her to these appointments because Plaintiff "gets
3   lost." (AR 317-18.) The ALJ then adjourned the hearing.

4       On April 22, 2004, the ALJ issued her decision analyzing
5   Plaintiff's claims under the Agency's five-step sequential evaluation
6   process. (AR 10-16.) At step one, the ALJ found that Plaintiff
7   "ha[d] not engaged in substantial gainful activity since her alleged
8   onset date." (AR 11.) Accordingly, the ALJ proceeded to the second
9   step.

10      At step two, the ALJ found that Plaintiff suffered from
11  "scoliosis and arthritis, impairments that are severe within the
12  meaning of the Regulations[.]" (*See* AR 12.) The ALJ went on to reach
13  step three, where she found that these impairments were "not severe
14  enough to meet or medically equal" a Listing. (*See* AR 13.)

15      Accordingly, the ALJ assessed Plaintiff's residual functional
16  capacity in light of the medical evidence. (*See* AR 13-14.)
17  Ultimately, she adopted the same limitations she had posed to the
18  vocational expert in her first hypothetical question at the hearing.
19  (*See* AR 14; *see also* AR 309.)

20      Based on this assessment of Plaintiff's residual functional
21  capacity, the ALJ reached the fourth step of the sequential process.
22  At step four, she found that Plaintiff could return to her prior work
23  as a waitress, fast-food worker, or cleaner. (AR 15.) Thus, the ALJ
24  concluded that Plaintiff was not disabled. (AR 16.)

25      Plaintiff timely requested review of the ALJ's decision. (AR
26  17.) The Appeals Council denied review on May 25, 2004, however, and
27  the decision of the ALJ became the final decision of the Agency. (AR
28  4-6.) Plaintiff then filed the instant Complaint in this Court.

III.

STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). Indeed, if the record evidence can reasonably support either confirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2003)(applying the harmless error standard).

7

1

IV.

2

DISCUSSION

3       Plaintiff claims that the ALJ erred in two respects.  First, she

4  contends that the ALJ failed to give proper consideration to the

5  testimony of her daughter, Elena Gutierrez.  (*See* Joint Stip. at 2-3.)

6  Second, Plaintiff faults the ALJ for failing to mention two GAF

7  assessments made by her treating psychiatrists.  (*See* Joint Stip. at

8  4-5.)  Each of Plaintiff's substantive arguments will be addressed

9  below.  For the reasons set forth below, however, the Court concludes

10  that neither claim has merit.

11  A.   The ALJ Properly Considered The Testimony Of Plaintiff's Daughter

12       Plaintiff argues that the ALJ "failed to consider" the testimony

13  of her daughter, Elena Gutierrez.  (*See* Joint Stip. at 3.)  After

14  reviewing the record, the Court concludes that this argument does not

15  warrant reversal of the decision.

16       "[L]ay witness testimony as to a claimant's symptoms or how an

17  impairment affects ability to work *is* competent evidence, and

18  therefore *cannot* be disregarded without comment."  *Nguyen v. Chater*,

19  100 F.3d 1462, 1467 (9th Cir. 1996)(emphasis in original and internal

20  citations omitted).  This is merely a specific instance of the general

21  rule that an ALJ must "consider observations by non-medical sources as

22  to how an impairment affects a claimant's ability to work."  *Sprague*

23  *v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  Moreover, pursuant to

24  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993), an ALJ is

25  obligated to give reasons germane to a lay witness's testimony before

26  discounting it, and cannot dismiss the testimony of lay witnesses

27  solely because he has found the claimant's testimony incredible.

28

An ALJ is, however, permitted to reject lay testimony if he gives legitimate reasons for doing so. *See Nguyen*, 100 F.3d at 1467. Although an ALJ should mention lay witness testimony in his decision, his failure to do so is not always error. *See Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984). When, for example, lay testimony conflicts with medical evidence, the ALJ may discount or even ignore it. *See id.; see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

In this case, the decision reflects that the ALJ specifically acknowledged the testimony of Ms. Gutierrez. The ALJ discussed Ms. Gutierrez' testimony, explaining why she found it and Plaintiff's testimony inconsistent with the medical evidence of record:

> The [ALJ] has considered [Plaintiff's] assertions of back pain and depression prohibiting the performance of ordinary activities and inability to perform all types of gainful employment. *Consideration has also been given to the testimony of [Plaintiff's] daughter, who asserted that she has to do cleaning and laundry for her mother, that she observes [Plaintiff] to cry two times a month, and that her mother sleeps most of the time.* [¶] [Plaintiff] is credible to the extent she does have medically determinable musculoskeletal impairments which could be expected to produce some symptomatology. However, the assertions as to the extent, intensity, and duration of the alleged subjective symptomatology and functional restrictions are not persuasive or consistent with the record as a whole. In this regard, a longitudinal review of the record discloses that [Plaintiff's] symptoms are well managed conservatively

with medication.  She is not described as a candidate for surgical procedures, nor has she required a series of hospitalizations or prolonged participation in a pain clinic for debilitating pathology unresponsive to medical management.  The examinations of record disclose that [Plaintiff] ambulates with a normal gait without the need of any assistive devices.  There is also a lack of objective manifestations of chronic pain, such as atrophy or wasting of the extremities.  [¶]  There is no good reason demonstrated in the record as to why [Plaintiff] would have the functional restrictions as a result of a musculoskeletal or mental impairment as asserted at the hearing.  With regard to her mental impairment in particular, the records demonstrate that [she] responded well with treatment. [Plaintiff] has also inconsistently reported the extent of her activities.  While she asserts that she does not like to leave her home or be in public because of nervousness, she also concedes that she leaves her home by walking, riding the bus or driving to attend doctors appointments and to shop.

(*See* AR 13-14 (citations to record omitted; emphasis added).)  A review of the record confirms that the ALJ summarized this testimony accurately.  (*See* AR 77-88, 313-18.)

A more probing review of the medical evidence shows that the ALJ's appraisal of the conflict between the medical record and Ms. Gutierrez' testimony is supported by substantial evidence.  (*Compare* AR 234, 237, 242-43 *with* AR 313-18.)  As Dr. Malancharuvil testified, Plaintiff's depression was "severe" for a few months after her suicide

10

1   attempt in October 2002, but did not persist for 12 consecutive
2   months.  (*See* AR 301-03.)  This opinion is based on a fair
3   interpretation of the medical record of Plaintiff's treatment for
4   depression.

5       Indeed, during the period before her suicide attempt, Dr.
6   Reynaldo Abejuela, M.D., an examining physician, performed a complete
7   psychiatric evaluation of Plaintiff.  (*See* AR 164-69.)  He opined that
8   her "occupational and social functioning [was] not severely impaired,"
9   explaining:

10          There is no severe restriction in [Plaintiff's] daily
11          activities.  There are no severe difficulties in social
12          functioning.  [Plaintiff's] concentration, persistence, and
13          pace are not severely impaired.  There is no repeated
14          emotional deterioration in work-like situations.  Her
15          ability to understand, carry out, and remember instructions
16          is not severely impaired.  Her response to co-workers and
17          supervisors and the public is not severely impaired.  Her
18          ability to deal with changes in a routine work setting is
19          not severely impaired.  There are no severe limitations due
20          to emotional impairment.

21   (AR 168.)  Ultimately, Dr. Arbejuela concluded that Plaintiff could
22   "follow simple and complex job instructions as long as she continues
23   to abstain from drugs and alcohol."  (AR 168.)  This opinion was
24   roughly consistent with the medical record from February 2000 up to
25   that date.  (*See* AR 96-134, 161-63, 271-81.)  Three weeks after Dr.
26   Arbejuela rendered his opinion, however, Plaintiff attempted suicide
27   by taking an overdose of Tylenol with Codeine.  (*See* AR 195-201.)  But
28

11

1    after one week in the hospital followed by four months of medication

2    and counseling, Plaintiff's mental health improved to the level it had

3    been before the suicide attempt.  (*See* AR 195-270.)

4        The record likewise supports the ALJ's conclusion that

5    Plaintiff's scoliosis or osteoarthritis, although severe, were not

6    severe enough to preclude all gainful employment.  (*See* AR 12, 13-14.)

7    Indeed, the sparsity of the treatment notes for these impairments

8    strongly suggests that they bothered Plaintiff very infrequently in

9    2000 and 2001, and that episodes of pain were treated successfully

10   with Celebrex.  (*See* AR 136-39, 141-48.)  Accordingly, the ALJ relied

11   on the reviewing physician's assessment of Plaintiff's residual

12   functional capacity.  (*See* AR 14, 149-56.)  Significantly, nothing in

13   Ms. Gutierrez' testimony--which focused mostly on Plaintiff's

14   psychological impairment--contradicted this assessment of Plaintiff's

15   physical capacities.  (*See* AR 312-18.)

16       In light of this record, it is clear that, contrary to

17   Plaintiff's contention that the ALJ erred by failing to "consider the

18   impact of this testimony on [] Plaintiff's ability to sustain

19   employment," (*see* Joint Stip. at 3), the ALJ did exactly that.[2]  Ms.

20

21       [2]  If the ALJ had rejected this testimony *solely* because it was
22   based on the self-reporting of symptoms from a claimant who already
     had been determined to be not credible, the error would require
23   reversal.  *See Dodrill*, 12 F.3d at 918-19.  In this case, however, the
     ALJ's rejection of Ms. Gutierrez' testimony evidently was predicated
24   on the *same reason* she offered for rejecting Plaintiff's testimony.
     (*See* AR 13.)  This distinction makes all the difference.  *See Brown v.*
25   *Massanari*, 231 F.Supp. 2d 1011, 1017 (D. Or. 2001)(affirming a denial
     of benefits where "the ALJ found that, like claimant's testimony, the
26   lay witness testimony was not entirely credible because it was not
     fully supported by the medical evidence and the record as a whole");
27   *see also Strauss v. Apfel*, 45 F.Supp. 2d 1043, 1048-49 (D. Or.
     1999)(finding that an ALJ properly could conclude that lay testimony

28

                                  12

Gutierrez' testimony did not contradict the weight of the medical evidence suggesting that Plaintiff's physical limitations did not preclude her from performing light work; to the extent that Ms. Gutierrez' observations flew in the face of the record, that inconsistency was a legitimate reason for rejecting her testimony. *See Lewis*, 236 F.3d at 511.

Even if the ALJ's failure to make plain her reasons for rejecting Ms. Gutierrez' testimony was erroneous, the Court concludes that any error would have been harmless in the circumstances of this case. The testimony of Ms. Gutierrez was, in all salient respects, cumulative of Plaintiff's testimony about her own limitations. (*Compare* AR 77-82, 291-301, 306-08, 311-12 *with* AR 83-88, 312-18.)  "[A]n ALJ's failure to explain his rejection of [lay] testimony constitutes harmless error when that testimony does little more than corroborate [the] plaintiff's testimony and adds nothing of substance to the record." *See Orcutt v. Barnhart*, No. ED CV 04-889 PLA, 2005 WL 2387702, at *10 (C.D. Cal. Sept. 27, 2005)(citing 20 C.F.R. §§ 404.1513(d), 416.913(d) and S.S.R. 88-13).  For this reason, and because the medical evidence supports the ALJ's conclusion that Plaintiff was not disabled, any error was harmless.  *See Batson*, 359 F.3d at 1197; *see also Vincent*, 739 F.2d at 1395 (holding that an ALJ's failure to discuss the claimant's son's testimony in his hearing decision was harmless because the medical evidence supported the ALJ's decision that the claimant was not disabled).

"was not credible because it was in conflict with the medical testimony and evidence" and could reject the claimant's testimony for the same reasons).

In sum, the Court concludes that the ALJ's partial rejection of Plaintiff's daughter's testimony was justified by the conflict between her testimony and the medical evidence of record.  For that reason, and because any error was harmless in the circumstances of this case, the ALJ's handling of this evidence does not require reversal.

B.    The ALJ Gave Sufficient Weight To The Opinions Of Plaintiff's
      Treating Physicians

Plaintiff complains that the ALJ gave short shrift to a pair of Global Assessment of Functioning ("GAF") scores assigned to Plaintiff by clinicians whom she describes as "treating psychiatrists."  (*See* Joint Stip. at 4-5.)  After reviewing the record, the Court concludes that the ALJ's failure to mention these scores did not amount to reversible error.

A treating physician's opinion on the nature and severity of an impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2).  As the Ninth Circuit has noted, however:

> [A]n ALJ need not give controlling weight to the opinion of
> a treating physician.  Although a treating physician's
> opinion is generally afforded the greatest weight in
> disability cases, it is not binding on an ALJ with respect
> to the existence of an impairment or the ultimate
> determination of disability.

*Batson*, 359 F.3d at 1194-95 (citation and internal quotation marks omitted).  Where a treating physician's opinion as to the effect of symptoms is based on subjective reports of the claimant, however, and

14

1   the ALJ has properly found the claimant is not credible, the ALJ may

2   properly reject the physician's opinion.  *See Fair v. Bowen*, 885 F.2d

3   597, 605 (9th Cir. 1989)(holding that, where the ALJ "properly

4   discounted" claimant's "subjective complaints," the ALJ properly could

5   disregard the opinion of the treating physician based on the

6   claimant's subjective complaints).  Indeed, "[t]he ALJ may disregard

7   the treating physician's opinion whether or not that opinion is

8   contradicted."  *Batson*, 359 F.3d at 1195 (citation omitted).

9        In this case, Plaintiff's only quarrel with the ALJ's handling of

10  the medical evidence is that it did not specifically account for two

11  GAF scores, both in the 41-50 range and both purportedly assessed by

12  treating physicians.  (*See* Joint Stip. at 4-5.)  The GAF scale is used

13  by clinicians to report an individual's overall level of functioning,

14  and measures a patient's level of functioning from 1 to 100, where the

15  lower end of the scale denotes minimal functioning and the upper end

16  corresponds to maximum functioning.[3]  *See American Psychiatric*

17  *Association, Diagnostic & Statistical Manual of Mental Disorders* (Text

18  Revision 4th ed. 2000) ("*DSM-IV*") at 32.  Despite its objective feel,

19  however, a GAF score is nothing more rigorous than "a *subjective*

20  determination that represents the clinician's judgment of the

21  individual's overall level of functioning."  *Edwards v. Barnhart,* 383

22  F.Supp. 2d 920, 924 n.1 (E.D. Mich. 2005)(emphasis added, internal

23  quotation marks omitted)(quoting the *DSM-IV*, p. 30); *accord Langley v.*

24  *Barnhart*, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004).  Because a GAF

25  _____

26       [3]  A GAF score between 41 and 50 indicates serious symptoms
    (*e.g.*, suicidal ideation, severe obsessional rituals, frequent
27  shoplifting) or any serious impairment in social, occupational, or
    school functioning (*e.g.*, no friends, unable to keep a job).  *See*
28  *Morgan*, 169 F.3d at 598 n.1.

15

1  score is assessed through the clinician's conversations with and
2  examination of the patient, the value of that score will depend in
3  large part upon the claimant's credibility. *See Hamilton v. Chater*,
4  942 F.Supp. 1354, 1361 (D. Or. 1996)(finding that an ALJ properly
5  rejected a treating physician's opinion that a claimant had a GAF of
6  50 and "was unable to work," where "his opinion appear[ed] to be based
7  on the claimant's subjective complaints regarding her physical
8  impairments, and [where] the claimant's subjective complaints [we]re
9  not entirely credible").  Thus, before addressing the specifics of the
10  Plaintiff's GAF scores, the Court must consider the consequences of
11  Plaintiff's failure to challenge the ALJ's finding that her own
12  testimony was not fully credible. (*See* Joint Stip. at 3-5; *see also*
13  AR 13-14.)

14      "Credibility determinations are the province of the ALJ." *Fair*,
15  885 F.2d at 604.  For that reason, this Court will not second-guess an
16  unchallenged credibility finding. *See Solomon v. Secretary of Health*
17  *and Human Services*, No. 91-CV-77171 DT, 1992 WL 478586, at *2 (E.D.
18  Mich. Aug. 13, 1992)("The Plaintiff has not challenged the ALJ's
19  determination of her credibility, and the Court accepts it as
20  accurate.").  Two important implications stem from this result.
21  First, where a claimant fails to challenge the ALJ's adverse
22  credibility finding, she cannot "show that the ALJ erred in her
23  decision not to credit [the treating physician's] assessment, which
24  was based in large part on [the claimant's] statements." *See Siska v.*
25  *Barnhart*, No. C 00-4788 MMC, 2002 WL 31750220, at *3 (N.D. Cal. Dec.
26  4, 2002).  Second, a claimant's failure to dispute the ALJ's finding
27  that her testimony was incredible means that, to the extent that *any*
28  of her arguments rely upon citations to her own testimony or

16

1    statements in the record, that argument "carries no weight."  *See*

2    *Stanistreet v. Chater*, 21 F.Supp. 2d 1129, 1135 n.15 (C.D. Cal. 1995);

3    *accord West v. Barnhart*, 254 F.Supp. 2d 1216, 1227 (D. Kan. 2003).

4    Bearing these implications in mind, the Court turns to Plaintiff's

5    specific assignments of error.

6        First, Plaintiff argues that the ALJ erred when she failed to

7    mention a GAF score of 47 supposedly assessed by "Dr. Henry Htwelay"

8    on October 22, 2001. (*See* Joint Stip. at 5.)  As Plaintiff points

9    out, the ALJ did not mention this score. (*See* AR 10-16.)  Although

10   the Agency does not dispute that Dr. Htwelay so found, (*see* Joint

11   Stip. at 7-8), a careful reading of the medical record indicates that

12   neither Dr. Htwelay nor any other *treating source* ever opined that

13   Plaintiff had a GAF of 47.  The GAF assessment to which Plaintiff

14   refers was made by "Memory Rush, M.S.W." (*See* AR 133.)  The record

15   does not reflect that Ms. Rush is a licensed or certified

16   psychologist; she is a social worker.  *See* 20 C.F.R. §§ 404.1513(a),

17   416.913(a)(listing acceptable medical sources).  Nor does the record

18   clearly show that Ms. Rush was acting as the "agent" of any doctor

19   when she performed the GAF assessment on October 22, 2001.[4]  In these

20

21        [4] A social worker can be an "acceptable source" of medical
22   evidence only if she acts as an agent of a licensed physician or
     psychologist. *See Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir.
23   1996).  This occurs where the social worker acts so "closely under the
     supervision" of the treating physician that the social worker's
24   opinion should be "properly considered as part of the opinion" of the
     treating physician.  *See id*. at 971.  Plaintiff does not contend, and
25   the evidence does not reflect, that Ms. Rush acted in such a capacity.
     Indeed, the record reflects that Dr. Htwelay did not see Ms. Rush's
26   GAF assessment until more than seven weeks later, on December 12,
     2001.  (*See* AR 133.)  Even then, Dr. Htwelay only signed as the
27   "Person Authorized To Diagnose" and signed again under the "Annual
     Physician Review For Medications"; the record does not show that Dr.
28

1  circumstances, although the regulations would have *permitted* the ALJ

2  to consider the report of a social worker as another medical source

3  and to consider Ms. Rush's GAF assessment in light of the particular

4  history of treatment, *see* 20 C.F.R. §§ 404.1527(d), 416.927(d), the

5  reports of other medical sources are afforded no inherent deference.[5]

6  *See Bunnell v. Sullivan*, 912 F.2d 1149, 1152 (9th Cir. 1990), *rev'd en*

7  *banc on other grounds*, 947 F.2d 341 (9th Cir. 1991).

8      Second, Plaintiff insists that the ALJ overlooked a GAF score of

9  50 assessed by a "treating psychiatrist." (*See* Joint Stip. at 4.)  A

10 review of the record confirms that, on March 13, 2003, an unidentified

11 clinician at the San Bernardino Department of Behavioral Health

12 entered a treatment note pegging Plaintiff's GAF at 50 during a

13 psychiatric evaluation. (*See* AR 238.)  Once more, the ALJ did not

14 mention this score, although she did summarize the medical evidence

15 containing it. (*See* AR 12.)  Even if the Court were to give Plaintiff

16 the benefit of the doubt and assume that this GAF score was assessed

17 by a treating physician and not a social worker, however, nothing in

18 the treatment notes of that day's examination suggests that the

19 clinician thought Plaintiff was disabled. (*See* AR 238-41.)  There is

20 no "Ninth Circuit authority[] that a GAF score of 50, by itself,

21

22 ───────────────

23 Htwelay or any other physician ever adopted Ms. Rush's diagnostic
   impressions, including her GAF assessment.

24     [5]  It is unclear what deferring to Ms. Rush's GAF assessment
   would mean in the circumstances.  The mere fact that Ms. Rush assigned
25 Plaintiff a GAF score of 47 does not necessarily indicate that she
   found her account of her subjective symptoms to be credible.  *See*
26 *Street v. Commissioner*, -- F. Supp. 2d. --, No. 04-72866, 2005 WL
   2317980 (E.D. Mich. Sept. 7, 2005)(noting that a mental health worker
27 assigned a claimant a GAF score of 35, even though she suspected that
   he had fabricated some of his history).
28

1   requires a finding of disability." *See also Purvis v. Commissioner of*
2   *Social Sec. Admin.*, 57 F. Supp. 2d 1088, 1093 (D. Or. 1999).  In these
3   circumstances, it is doubtful that any GAF assessment within this
4   range could meet a claimant's burden of proving that she is disabled.
5   *See Morgan*, 169 F.3d at 598 (upholding the ALJ's decision that a
6   claimant was capable of working, despite his depression, personality
7   disorder, and a GAF as low as 45).

8        In the end, the GAF scores in the medical record are the result
9   of subjective assessments made by clinicians: one of whom may not have
10  even been a doctor, and the other of whom certainly was not.  Although
11  the ALJ did not mention these scores specifically, she did note the
12  lack of objective evidence that Plaintiff was unable to work.  (*See* AR
13  12-14.)  The absence of objective clinical findings is sufficiently
14  specific and legitimate reason to reject treating clinicians' opinions
15  generally, including their GAF assessments.  *See Johnson v. Shalala*,
16  60 F.3d 1428, 1432 (9th Cir. 1995).  This determination was proper
17  here, particularly given that the GAF assessments themselves were
18  informed by subjective symptom complaints from a claimant whom the ALJ
19  found not entirely credible: a finding that Plaintiff has not
20  challenged here.  *See Siska*, 2002 WL 31750220, at *3.  Accordingly,
21  the Court concludes that reversal is unwarranted.[6]

22

23

24

25       [6]  In affirming the Agency's decision, the Court notes that it is
26  not endorsing the ALJ's practice here of not clearly enunciating its
    reasons for rejecting the daughter's testimony and the GAF scores.
27  Had the ALJ been more clear, there may not have been an appeal.  Even
    if there had been, this Court's decision could have been reduced to
28  five pages.

                                    19

1

                                        V.

2                                   CONCLUSION

3        For the reasons set forth above, this Court concludes that the

4   Agency's findings are supported by substantial evidence and are free

5   from material legal error.   Therefore, the Court AFFIRMS the decision

6   of the Agency and enters summary judgment in favor of the Agency and

7   against Plaintiff.

8

9        IT IS SO ORDERED.

10

11       DATED:      January  25 , 2006.

12

13                               _____/s/_____
                                 PATRICK J. WALSH
14                               UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

S:\PJW\Cases-Soc Sec\SALAZAR, S 834\Memo Opinion.wpd

                                        20